UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN PROUTY,<br>    Plaintiff,<br>  v.<br><br>RAMAKRISHNA THIPPANNA, M.D.;<br>BOGDAN, NEDELSCU, M.D.; and<br>DOUGLAS PARKER, PERSONAL<br>REPRESENTATIVE OF THE ESTATE OF<br>CAROLYN PARKER, R.N.,<br>    Defendants. | CIVIL ACTION<br>NO. 4:17-40126 TSH |

### ORDER ON DEFENDANTS' MOTION IN LIMINE TO BAR TESTIMONY FROM PATRICIA PACEY, Ph.D., AND CRAIG LICHTBLAU, M.D. (Docket No. 306)

**MAY 26, 2021**

**HILLMAN, D.J.,**

  This is a medical malpractice action brought by Plaintiff against Defendants based upon the medical treatment they provided to her during her admission to the Life Care Center of Auburn ("LCCA"), a skilled nursing and rehabilitation facility, from November 21 to December 19, 2014. Before the Court is Defendants' motion in limine to bar testimony from Plaintiff's experts Dr. Patricia Pacey, Ph.D. and Dr. Craig Lichtblau. After hearing argument on the motion at the pretrial conference on May 19, 2021, the motion is ***granted in part and denied in part***. Dr. Pacey is barred from testifying for failure to supplement her damages report. Dr. Lichtblau may testify as to Plaintiff's life expectancy.

*Background*

On October 3, 2014, Plaintiff was admitted to UMass Memorial Medical Center for pain management after fracturing her ribs in a fall. (Docket No. 208 at 1). Doctors inserted an epidural catheter into her T7 vertebra. (Docket No. 208 at 1). On October 5, 2014, they moved the catheter from her T7 vertebra to her T5 vertebra. (Docket No. 208 at 1). After the switch, Plaintiff reported increasing numbness and weakness in her lower extremities; she was diagnosed with partial paraplegia and bowel and bladder incontinence two days later. (Docket No. 208 at 2). An MRI of her thoracic spine revealed an epidural hematoma between her T2 and T7 vertebrae. (Docket No. 208 at 2). Doctors performed an emergency laminectomy and epidural evacuation. (Docket No. 208 at 2). Although Plaintiff experienced some increase in strength following the procedure, her bilateral lower extremity weakness and bowel and bladder incontinence persisted. (Docket No. 208 at 2).

On October 15, 2014, Plaintiff was discharged to Fairlawn Rehabilitation Hospital, an acute rehabilitation facility. (Docket No. 208 at 3). She transferred from Fairlawn Rehabilitation Hospital to LCCA on November 21, 2014. (Docket No. 208 at 3). "Upon admission to LCCA, and prior to any alleged actions or inactions of the [LCCA] Defendants, the Plaintiff's bilateral paraplegia, weakness in her lower extremities, and bowel and bladder incontinence continued." (Docket No. 208 at 3). During her time at LCCA, Plaintiff additionally developed increasing lower extremity weakness and pain; lower limb contractures; pressure ulcers on her heels; and a Stage IV pressure ulcer on her coccyx area. (Docket No. 208 at 4–5; see also Docket Nos. 208-1 at 6, 208-2 at 10–15, 208-4 at 4, 208-5 at 4, 208-6 at 4). Plaintiff was discharged from LCCA on December 19, 2014.

*Procedural History*

Plaintiff filed suit on November 14, 2017 against UMass Memorial, LCCA, and various medical providers who treated her at each institution.[1] Numerous disputes concerning medical record production and expert testimony prolonged the discovery process, but Plaintiff ultimately settled her claims against the UMass Defendants and LCCA. The remaining Defendants in the case, Dr. Thippanna, Dr. Nedelescu,[2] and Douglas Parker[3]—the providers who treated Plaintiff at LCCA—filed a motion for partial summary judgment on March 3, 2020, asking the Court to find that they could not be held liable for any injuries Plaintiff sustained at UMass or Fairlawn before her transfer to LCCA on November 21, 2014. (Docket No. 188).

On May 7, 2020, I granted the motion, finding that neither Dr. Thippanna, Dr. Nedelescu, nor APRN Parker were liable for Plaintiff's incontinence or lower extremity partial paraplegia because she sustained those injuries before any physician-patient relationship was established between them and Plaintiff. (Docket No. 223). That order limited Plaintiff's damages to past and future medical expenses and pain and suffering connected to her pressure ulcers and lower limb contracture injuries.

The Lichtblau Report

Plaintiff tendered Dr. Lichtblau's expert disclosure on March 18, 2019. (Docket Nos. 331-3, 331-4).[4] Dr. Lichtblau reviewed Plaintiff's medical records and conducted a physical

---

[1] The Court allowed Plaintiff to substitute Fairlawn Medical Investors, LLC with Auburn Medical Investors, LLC, the entity which owns LCCA.
[2] Dr. Nedelescu contends that Plaintiff was not his patient, and thus he owed her no duty of care during her stay at LCCA. Plaintiff disputes this.
[3] Douglas Parker represents the estate of his deceased wife, Carolyn Parker, an Advanced Practice Registered Nurse ("APRN") who treated Plaintiff at LCCA. (Docket No. 59).
[4] These are excerpts of Dr. Lichtblau's reports which contain some key findings.

examination, and had Plaintiff perform a physical test using the BTE Technologies Evaluation System on February 21, 2019.  He prepared two reports: a Comprehensive Medical Evaluation and a Functional Capacity Opinion.  (*Id.*).  Neither report has been supplemented.

The Comprehensive Medical Evaluation contains Plaintiff's medical history through February 2019, written using Plaintiff and Jane Prouty's statements to Dr. Lichtblau or his employees during the physical examination and medical records provided by the Plaintiff's attorneys, which included records from UMass and Fairlawn but no records from LCCA. (Docket No. 331-3 at 17-18).  In a section of the report titled "Diagnostic Impressions," Dr. Lichtblau noted "development of a Stage IV decubitus ulcer secondary to improper care at Auburn Medical Investors d/b/a Life Care Centers of Auburn."  (¶¶ 14, 16, 20, 27, 28).  At his deposition, Dr. Lichtblau clarified that he held the opinion that LCCA provided "inappropriate care" to Plaintiff because "[i]f [patients] [a]re turned appropriately, they should not have decubiti [ulcers] period. That's the end of it." but that his testimony would be limited to "impairment, cost for future medical care, and life expectancy." (Lichtblau Dep. 91:9-92:7, Docket No. 331-5).  The Comprehensive Medical Evaluation concluded that Plaintiff "has sustained a significant impairment, disability, and cost for future medical care."  (Docket No. 331-3 at 25).

Dr. Lichtblau performed a Functional Capacity Assessment to measure the extent of Plaintiff's physical disabilities on February 21, 2019.  He determined that, to a reasonable degree of medical certainty, Plaintiff would need "24 hour aid and attendant care secondary to a significant fall risk" for the rest of her life, and that she lacked "the functional capacity to participate in her activities of daily living without assistance." (Docket No. 331-4 at 6-7).  The report also reiterated Dr. Lichtblau's observation that Plaintiff's Stage IV coccyx pressure ulcer was "secondary to improper care" at LCCA. (¶¶ 14, 16, 20, 27, 29).

The Pacey Report

Also on March 18, 2019, Plaintiff tendered Dr. Pacey's expert disclosure regarding Plaintiff's economic losses from injuries related to her medical care during hospitalizations *between October 2014 and January 2015*. (Docket No. 331-2) (emphasis added).

In total, Dr. Pacey valued Plaintiff's past and future economic losses at $3,091,000. Dr. Pacey based her calculations on Dr. Lichtblau's opinion that Plaintiff would likely live another 11.7 years.[5] As to past damages, Dr. Pacey opined that Plaintiff had previously incurred $191,100 in personal care assistance costs from the date of her injury through March 2019.[6] (*Id.* at 4). As to future damages, Dr. Pacey opined that Plaintiff would incur $2,899,900 for medical care, diagnostic tests, pain control, support care, home modifications, rehabilitation requirement, mobility equipment, medical supplies, and medications during the remainder of her life.

Critically, Dr. Pacey's damages calculations do not distinguish between costs for the partial paraplegia and incontinence attributable to the now-dismissed UMass Defendants and costs for the injuries attributable to the remaining Defendants. In fact, her report does not provide any damages for the Stage IV pressure ulcer on Plaintiff's coccyx that developed while she was a patient at LCCA; it stipulates that "'[c]ontinuation of [c]are costs specific to the Stage 4 ulcer are not identified separately in this analysis at this time, but can be provided if necessary." (*Id*. at 4). Furthermore, the report makes no reference to past or future costs for limb contractures. It contains one additional reference to pressure ulcers: that Plaintiff may incur future costs, in an amount "TBD," to treat the complications of immobility, including decubitus

---

[5] The U.S. Vital Statistics gave an additional life expectancy of 13.3 years, but Dr. Pacey applied Dr. Lichtblau's reduced life expectancy of 11.7 years.

[6] Dr. Pacey's report did not include past medical or life care expenses, just the replacement value of the support care that Plaintiff's family provided between the time of her injury and March 2019.

ulcers (among other conditions). Because Plaintiff's immobility is attributable to the UMass Defendants, this measure of damages would not be applicable against Defendants at trial even if Dr. Pacey had provided a dollar figure for such costs.

Motion in Limine # 331

Plaintiff listed Dr. Pacey as an anticipated witness and Dr. Lichtblau as a reserve witness at trial. (Docket No. 320). Defendants filed this motion in limine to preclude their testimony. Plaintiff opposes the motion, arguing that she never withdrew either expert disclosure, that Dr. Lichtblau's testimony is highly probative of Plaintiff's disability status and life expectancy, and that Dr. Pacey "has always been disclosed as someone who would testify regarding Karen Prouty's past medical expenses as well as the methodology Dr. Pacey would use (and did use) to calculate future damages." (Docket No. 356 at 3).

**Discussion**

Rule 26 of the Federal Rules of Civil Procedure governs expert testimony at trial. An expert witness' report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." R. 26(a)(2)(b)(i). Parties have a duty to supplement their expert reports to ensure completeness "by the time that pretrial disclosures under Rule 26(a)(3) are due." 26(e)(2).

"Complete and timely disclosures and supplementation ensure an even playing field, preventing any party from gaining an "unfair tactical advantage" at trial." *Lohnes v. Level 3 Comm., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001). "Pursuant to Rule 37(c)(1), incomplete or late disclosures may result in (among other possible sanctions) the preclusion of the "relevant expert information . . . 'at a hearing, or at a trial, unless the failure was substantially justified or

6

harmless.'" *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 77 (1st Cir. 2009). When asked to preclude expert testimony or allow an untimely disclosure, a court should consider "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects," as well as "[s]uprise and prejudice." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992).

*Whether Dr. Pacey May Testify*

Plaintiff had more than 12 months' notice to supplement Dr. Pacey's report to divide the damages by the injuries attributed to each group of Defendants. This Court explicitly held that Drs. Thippanna, Nedelescu, and APRN Parker were not liable for Plaintiff's paraplegia and incontinence in its partial summary judgment order on May 7, 2020, and the UMass Defendants were dismissed from the case on May 12, 2020. (*See* Docket Nos. 223, 227). Accordingly, Plaintiff should have realized that Dr. Pacey's initial disclosure, which did not divide damages by harms attributed to UMass or LCCA, was incomplete.

Allowing Dr. Pacey to testify as to Plaintiff's economic losses attributable to Defendants would constitute unfair surprise and risks serious prejudice against Defendants. As discussed *supra*, Dr. Pacey's $3.1 million damages assessment entangles the damages stemming from Plaintiff's paraplegia and incontinence—divisible injuries for which Defendants cannot be held liable—with the damages attributable to Defendants. If Dr. Pacey were to testify, Defendants would have no warning how she would apportion the $3.1 million total damages award to account for the remaining injuries at issue in this case. Without knowing what she will testify at trial, Defendants cannot prepare their witnesses to respond or adjust their trial strategy. This testimony by ambush could also be highly prejudicial. Defendants did not retain their own

damages expert or depose Dr. Pacey in reliance that Dr. Pacey would not testify so far outside the scope of her supplemented disclosure.

Plaintiff's argument that Dr. Pacey "has always been disclosed as someone would testify regarding [Plaintiff's] past medical expenses as well as the methodology Dr. Pacey would use (and did use) to calculate future damages" rings hollow.  Dr. Pacey's methodology for calculating damages is flawed because Plaintiff failed to have Dr. Pacey amend her disclosure after the ruling on partial summary judgment clarified that the UMass Defendants and Dr. Thippanna, Dr. Nedelescu, and APRN Parker are not jointly and severally liable for Plaintiff's injuries following her October 3, 2014 fall.  Therefore, her unsupplemented testimony as to how to calculate future damages would not be probative as to damages against the remaining Defendants.

There is a second reason why I am reluctant to allow Dr. Pacey to testify as to damages without an amended disclosure.  Dr. Pacey based her damages calculations on the average prices and need for medical care provided in Dr. Lichtblau's report.  (Pacey Rep., Docket No. 331-2 at 4) ("Future medical/life care expenses are based on the recommendations in the Continuum of Care section of the Preliminary Comprehensive Evaluation provided by Dr. Craig Lichtblau, the rehabilitation specialist.")).  In his deposition, Dr. Lichtblau explained that he sourced prices for Plaintiff's care and necessary medical supplies in Ocala, Florida, Plaintiff's former residence, and that he would probably have to do an updated report if she relocated.  (Lichtblau Dep. 66:14-20 ("So the truth of the matter is, depending on where she goes and what happens to her, I probably will have to do an updated report, especially if she moves.  She's going to have a continuation of care with updated prices because Ocala, Florida, is horse country, and it's not sophisticated.")).  Plaintiff has now relocated to Massachusetts, meaning that the baseline prices

for care or supplies are likely higher and Dr. Pacey's future damages calculations are stale. Furthermore, Dr. Lichtblau explained that if the case did not move to trial within three to four months of his October 2019 deposition date, Plaintiff could become "medically fragile" and require a higher level of support care, such as care from a registered nurse rather than a certified nurse assistance which would be more expensive. (73:8-15). Indeed, Dr. Lichtblau indicated at his deposition that it was his understanding that Plaintiff had become medically fragile since his initial disclosure. (74:15-19). We are now a year and half beyond October 2019, with no update to either Dr. Pacey's report or Dr. Lichtblau's report to reflect Massachusetts prices or whether Plaintiff's future medical needs have changed.

I find that Plaintiff's failure to supplement Dr. Pacey's March 2019 expert report for more than one year warrants precluding her testifying at trial.

*Whether Dr. Lichtblau May Testify*

Plaintiff seeks to use Dr. Lichtblau's testimony in two ways: to demonstrate Plaintiff's disability status, and to opine as to Plaintiff's life expectancy.

Plaintiff's life expectancy is relevant because Plaintiff's standard of care expert, Dr. Seignious, has opined that Plaintiff's history of pressure ulcers at LCCA puts her at an increased risk of developing pressure ulcers. If the jury finds one or more of the Defendants liable and agrees with Dr. Seignious, then the jury they will need to know Plaintiff's estimated life span to tailor a damages award to compensate Plaintiff for that increased risk.

I agree that Dr. Lichtblau's testimony on Plaintiff's life expectancy was previously disclosed in accordance with R. 26 and is probative on Plaintiff's increased risk of pressure ulcers damages theory. Therefore, I will allow Dr. Lichtblau to testify as to Plaintiff's life expectancy. However, Dr. Lichtblau's life expectancy determination was made in March 2019,

9

and at his deposition in October 2019, Dr. Lichtblau observed that Plaintiff's health had substantially deteriorated since his initial report.[7] Unlike the considerable prejudice and unfair surprise inherent in Dr. Pacey's testimony, however, Defendants have Plaintiff's medical records and will be able to cross-examine Dr. Lichtblau on whether his March 2019 life expectancy assessment is still valid. Therefore, I will allow Dr. Lichtblau to testify as to Plaintiff's life expectancy.

I will not allow Dr. Lichtblau to testify as to Plaintiff's disability status. Plaintiff has not shown how whether Plaintiff was permanently disabled in March 2019 is relevant to Defendants' liability for medical malpractice or (should the jury find one or more Defendants liable) her damages arising from past medical expenses, future medical expenses, or pain and suffering arising from the pressure ulcers and lower limb contractures. The mere fact that the parties listed whether the Plaintiff is permanently disabled and, if so, when her disability began, as a contested issue of fact in their Joint Pretrial Memorandum does not establish the relevance of such testimony. (Docket No. 330 at 7).

## Conclusion

Motion in Limine # 331 is ***granted in part***. Dr. Lichtblau may testify to Plaintiff's life expectancy. Dr. Pacey is barred from testifying for failure to supplement her damages report. Dr. Lichtblau may testify as to Plaintiff's life expectancy.

---

[7] "[Dr. Lichtblau]: My understanding is she's not doing well. She's --- she can do very little for herself now. She needs 24-hour care. And my understanding is she's probably going to – I mean, they're looking to find a nursing home for her now. She can't do anything. So she's going down the tubes. . . Seven months have gone forward [since Dr. Lichtblau's initial disclosure] and she's having problems. I knew this would happen. So if this litigation doesn't you know, move forward at a reasonable rate - - let's say this doesn't go on for another six months or something, I really should see the patient again. I should find out where the patient is living, what geographic location, and update my opinions." (Lichtblau Dep. 64:18-24; 69:4-11).

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN
DISTRICT JUDGE**